AO 442 (Rev. 11/11) Arrest Warrant

# UNITED STATES DISTRICT COURT
for the
District of Maryland

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| Rodney Burton aka "Bitcoin Rodney" | ) Case No.  1:23-mj-03185-CDA |
| | ) **24-2002-MJ-LOUIS** |
| | ) |
| | ) |
| | ) |
| _Defendant_ | |

FILED BY __MP__ D.C.

Jan 4, 2024

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

## ARREST WARRANT

To: Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay
_(name of person to be arrested)_ Rodney Burton,
who is accused of an offense or violation based on the following document filed with the court:

❏ Indictment   ❏ Superseding Indictment   ❏ Information   ❏ Superseding Information   ☑ Complaint
❏ Probation Violation Petition   ❏ Supervised Release Violation Petition   ❏ Violation Notice   ❏ Order of the Court

This offense is briefly described as follows:

18 U.S.C. § 1960 (Operating unlicensed money transmitting business) and 18 U.S.C. § 371 (Conspiracy to operate unlicensed money transmitting business)

Date: December 29, 2023

_Issuing officer's signature_

City and state: Baltimore, Maryland

Charles D. Austin, U.S. Magistrate Judge
_Printed name and title_

---

**Return**

This warrant was received on _(date)_ _____, and the person was arrested on _(date)_ _____
at _(city and state)_ _____.

Date: _____

_Arresting officer's signature_

_Printed name and title_

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| | * |
| v. | * |
| | * |
| RODNEY BURTON aka "BITCOIN RODNEY" | *   CRIMINAL NO. 1:23-mj-03185-CDA |
| | *   24-2002-MJ-LOUIS |
| Defendant | * |

*******

## MOTION TO SEAL

Now comes the United States of America, by its attorneys, Erek L. Barron, United States Attorney for the District of Maryland, and Spencer L. Todd, Assistant United States Attorney for said District, and respectfully moves this Court to order that this Criminal Complaint, Arrest Warrant, and related documents be **SEALED** as the defendant is unaware of the investigation.

Respectfully submitted,

Erek L. Barron
United States Attorney

By: _____
Spencer Todd
Assistant United States Attorney

ORDERED as prayed this 29th day of December, 2023.

_____
Charles D. Austin
United States Magistrate Judge

AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
District of Maryland

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| | ) | Case No.   1:23-mj-03185-CDA |
| | ) | **24-2002-MJ-LOUIS** |
| Rodney Burton aka "Bitcoin Rodney" | ) | |
| *Defendant(s)* | ) | |

FILED BY____MP____D.C.
Jan 4, 2024
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of   July 2020 to January 2022   in the county of   Anne Arundel   in the
_____ District of   Maryland   , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1960 | Operation of an unlicensed money transmitting business |
| 18 U.S.C. § 371 | Conspiracy to operate an unlicensed money transmitting business |

This criminal complaint is based on these facts:

See Affidavit of Special Agent Andrew Accardi, which is attached hereto and incorporated herein by reference.

☑ Continued on the attached sheet.

*Complainant's signature*

Andrew Accardi, IRS
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   December 29, 2023

*Judge's signature*

City and state:   Baltimore, Maryland         Charles D. Austin, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**RODNEY BURTON aka "BITCOIN RODNEY,"**<br><br>**Defendant.** | Case No. 1:23-mj-03185-CDA<br><br>**FILED UNDER SEAL** |

**AFFIDAVIT IN SUPPORT OF**
**CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Andrew J. Accardi, being duly sworn, hereby declare as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I am a Special Agent with Internal Revenue Service – Criminal Investigation ("IRS-CI") in its Washington, D.C. Field Office. As such, I am "an investigative or law enforcement officer of the United States" within the meaning of 18 U.S.C. § 2510(7) and empowered by law to conduct investigations and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

2. I completed the Federal Criminal Investigator Training Program and the IRS-CI's Special Agent Investigative Techniques training at the Federal Law Enforcement Training Centers located in Glynco, Georgia, and Charleston, South Carolina. I received 26 weeks of intensive training in tax, money laundering, and other financial-crime investigations.

3. I received both a Bachelor of Science and a Master of Science in Accounting from the College of Saint Rose in 2013. I have been employed by IRS-CI since October 2018 and have

1

approximately four years total federal law-enforcement experience with IRS-CI. Within that time, I have participated in and conducted complex financial criminal investigations.

4. As a Special Agent, I am personally familiar with and have used various methods of investigation, including, but not limited to, visual surveillance, electronic surveillance, informant and witness interviews, subpoenas, financial analysis, and undercover operations. Through such investigations and training, I have become familiar with the patterns of activity of persons associated with financial crimes, money laundering, and various types of fraud. I have also become familiar with the methods, language, and terms that are used to disguise the source and nature of illegal activity and profits.

5. The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This Affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter or investigation. Moreover, where in this Affidavit I describe or refer to a statement made by an individual, that statement is described in substance and in part—it is not intended to be a verbatim recitation of the entire statement made by that individual.

6. I make this Affidavit in support of a criminal complaint and arrest warrant for **RODNEY BURTON** (**BURTON**) aka "Bitcoin Rodney." Based on the following facts, there is probable cause to believe that, in the District of Maryland and elsewhere, **BURTON** committed violations of 18 U.S.C. § 1960 (Operating Unlicensed Money Transmitting Business) and 18 U.S.C. § 371 (Conspiracy to Operate Unlicensed Money Transmitting Business).

## BACKGROUND

### *Cryptocurrency*

7. The term "cryptocurrency" as used herein refers to a currency issued and/or transferred using blockchain or distributed ledger technology, including currencies often referred to as "virtual currencies" and digital "coins."

8. A blockchain or distributed ledger is a database spread across a network of computers that records transactions in theoretically unchangeable, digitally recorded data packages, referred to as "blocks." These systems typically rely on cryptographic techniques to secure recording of transactions.

9. I understand through my training that someone who wishes to purchase cryptocurrency generally would visit a digital cryptocurrency exchange or broker and create an account through the exchange/broker's platform. The user would then deposit money into the crypto account by, e.g., linking their bank account, authorizing a wire transfer, or making a payment with a debit or credit card. Using these funds, the user would then place an order for the cryptocurrency of choice.

10. Some cryptocurrencies purport to be "stablecoins." A "stablecoin" is a type of cryptocurrency in which the value of the digital asset is purportedly pegged to a reference asset, which may be fiat money, exchange-traded commodities (such as precious metals), or another cryptocurrency.

11. One such cryptocurrency is "Tether," aka USDT, launched by the company Tether Limited Inc. It is purportedly pegged on a one-to-one basis with the U.S. dollar.

*Regulatory Background*

12. 18 U.S.C. § 1960(a) makes it a crime to "knowingly conduct[], control[], manage[], supervise[], direct[], or own[] all or part of an unlicensed money transmitting business."

13. The term "unlicensed money transmitting business" is defined to mean a "money transmitting business which affects interstate or foreign commerce in any manner or degree" and, as relevant, "fails to comply with the money transmitting business registration requirements under" 31 U.S.C. § 5330. 18 U.S.C. § 1960(b)(1).

14. "Money transmitting" is defined to include "transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier." *Id*. § 1960(b)(2).

15. Individuals or entities that wish to operate a money transmitting service must register their business with the Financial Crimes Enforcement Network ("FinCEN"), a bureau of the U.S. Department of the Treasury. *See* 31 U.S.C. § 5330(a)(1); 31 C.F.R. § 1022.380. FinCEN regulations govern money transmitting business registration requirements.

16. FinCEN regulatory guidance makes clear that "money transmission" services include "the acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means."[1] FinCEN guidance further clarifies that the term "value that substitutes for currency" includes "convertible virtual currency" such as cryptocurrencies.[2] Thus, transactions denominated in whole or in part in cryptocurrencies are subject to FinCEN regulations and fall within the ambit of 18 U.S.C. § 1960.

---

[1] Fin. Crimes Enf't Network, *Application of FinCEN's Regulations to Certain Business Models Involving Convertible Virtual Currencies*, FIN-2019-G001 (May 9, 2019), at 4.

[2] *Id*. at 7.

## *HyperFund*

17.     **BURTON** was a promoter of Hyperfund, aka "HyperTech," aka "HyperCapital," aka "HyperVerse," aka "HyperNation" (collectively, "HyperFund"), an unincorporated organization established in approximately June 2020.  HyperFund operated a purportedly legitimate decentralized finance, or "DeFi," cryptocurrency investment platform.

18.     A network of HyperFund promotors, in the District of Maryland and elsewhere, made fraudulent promotional presentations to investors and potential investors.  In those presentations, promoters touted HyperFund's investment programs, including the purported returns that prospective investors could earn from investing with HyperFund.  Potential investors were told that they could purchase "memberships" in the "world's most sustainable passive rewards program."

19.     Among other representations, HyperFund falsely claimed that investors who purchased "memberships" would receive between 0.5% to 1% daily in passive rewards until HyperFund doubled or tripled the investor's initial investment.

20.     To convince investors that HyperFund could make these daily payments of passive rewards, HyperFund claimed that its payments would be disbursed in part from revenues generated from large-scale crypto mining operations.  In fact, HyperFund did not have any such operations. To the extent investors saw the accrual of any rewards, those investors were paid with funds collected from more recent investors.

21.     HyperFund rewards took the form of "HU," aka "hyper units," aka "HyperUSD," a trading currency internal to HyperFund.  HyperFund claimed that HU had parity with the U.S. dollar.   HyperFund's investors typically acquired HU by converting fiat currency to the cryptocurrency Tether via a digital exchange, transferring that Tether to HyperFund's platform,

and finally exchanging that Tether for HU. An image from HyperFund's marketing material appears below:



22.     Initially, investors who sought to withdraw their funds were able to convert HU to Tether through HyperFund's platform and convert that cryptocurrency to fiat currency. However, beginning in at least July 2021 HyperFund began blocking investors' ability to withdraw HU and convert it to cryptocurrency (which could in turn be converted to fiat currency). Although HyperFund investors could not convert their HU to cryptocurrency after this point, they could transfer HU to other investors' HyperFund accounts.

23.     HyperFund conducted its business principally by means of websites, including http://thehyperfund.online, https://thehyperfund.com/, https://h5.thehyperverse.net/, and https://www.thehyperverse.net/ (collectively, the "HyperFund Websites"). The HyperFund

Websites were accessible worldwide to the public, including to prospective investors residing within the District of Maryland.

## BURTON'S ACTIVITIES

24.     **BURTON** offered and promoted the HyperFund platform as an investment of money into a common enterprise with other investors. **BURTON** maintained a HyperFund account in which he stored Tether and HU.

25.     At all times material to this Complaint, **BURTON** was the sole owner of several corporations that purportedly offered consulting services, including Burton Holdings Co. LLC, RBJ Consulting, Inc., and The Bit Group, LLC.

26.     As described further below, beginning in or about July 2020—shortly after HyperFund was established—and through in or about January 2022, **BURTON** accepted U.S. dollars from investors in HyperFund, in the form of checks or wire transfers. In exchange for those payments and a three percent fee, **BURTON** transferred a purportedly equivalent amount of Tether cryptocurrency and/or HU from his HyperFund account to the investors' HyperFund accounts.

27.     **BURTON** communicated with other HyperFund promoters regarding accepting U.S. dollars in exchange for Tether and/or HU. He advised Individual 1, a resident of Anne Arundel County and another HyperFund promoter, to instruct investors to send U.S. dollars (via wire or check) with the memo line "Consultation/Training," even though no consulting services were rendered. **BURTON** told Individual 1 that the reason for so instructing investors was to avoid drawing scrutiny from banks, as the banks might shut down their accounts. Consistent with that instruction, in a representative text message sent on June 26, 2021, at 9:58 a.m., **BURTON** provided Individual 1 with wire information for Burton Holdings Co. and stated that the memo should say "CONSULTING."

28.  **BURTON** and Individual 1 frequently communicated about taking U.S. dollars from HyperFund investors and crediting a purportedly equivalent amount of Tether or HU to investors' HyperFund accounts. **BURTON** and Individual 1 also frequently transferred Tether and/or HU between their own HyperFund accounts to facilitate crediting payments of U.S. dollars to investors' HyperFund accounts.

   a. For example, on August 10, 2021, at 6:27 p.m., Individual 1 asked **BURTON** to transfer HU to Individual 1 because she had "one guy for 50k and 3 people for 30k."

   b. Likewise, on August 13, 2021, at 12:01 p.m., Individual 1 texted **BURTON** stating "I owed you 140,000 HU. Wire for 51k hit. 30k hit, 31k hit. I have a cashiers check made out to you for 20k that I will deposit and send you a picture of the receipt and this 16,583 wire that was sent this morning. So that's a total of 148,100. So all that I would need from you in HU is 8,100."

   c. On August 12, 2021, at 4:33 p.m., Individual 1 texted **BURTON** to ask if "the 30k hit your account today for [Victim-Investor 1]." An analysis of the bank account for Burton Holdings Co. reflects an August 12, 2021, wire transfer in the amount of $30,900—$30,000 plus a 3 percent fee equaling $900—from Victim-Investor 1. The memo line states "Ref: [Victim-Investor 1], Training & Consultation."

29.  **BURTON** also communicated with Individual 2, another HyperFund promoter. Individual 2 frequently alerted **BURTON** to payments of U.S. dollars from HyperFund investors who wanted an equivalent amount of Tether and/or HU credited to their HyperFund account.

   a. For example, on April 6, 2021, at 2:20 p.m., Individual 2 texted **BURTON** to alert him to a HyperFund investor, Victim-Investor 2, who is "freaking out a little," and

8

asked about "timeframe on his funding." An analysis of the bank account for Burton Holdings Co. reflects a cashier's check posted on March 31, 2021, from Victim-Investor 2 in the amount of $10,000. The memo line states "Consulting." Several days later, on April 14, 2021, at 2:52 p.m., **BURTON** texted Individual 2 saying "Yes I got that one [Victim-Investor 2]."

b. On April 14, 2021, at 8:52 a.m., Individual 2 texted **BURTON** "to make sure nothing is going on with Hyperfund" because, among other reasons "[y]ou said don't send anymore money up let you catch up." Two minutes later, at 8:54 a.m., **BURTON** responded saying "Lol, no nothing is wrong. I said let me catch up cause I got so many checks that ppl are sending me. I'm adding to my portfolio. I still haven't finished funding the ones I got."

30. On March 2, 2021, Victim-Investor 3, a then-resident of Montgomery Village, Maryland, transferred $40,000 to **BURTON** by means of a wire transfer to Burton Holdings Co. The memo line stated, "Membership Registration." On March 17, 2021, Victim-Investor 3 wired an additional $10,000 to The Bit Group, LLC. The memo line was blank. On April 9, 2021, Victim-Investor 3's wife, Victim-Investor 4, posted $20,500 to Burton Holdings Co. in the form of a cashier's check. The memo line stated, "Consulting Fund hypercyn account." Victim-Investor 4 was also then a resident of Montgomery Village, Maryland.

31. In an interview, Victim-Investor 4 informed me that the payments to **BURTON** were in fact intended to transfer him U.S. dollars, in exchange for which **BURTON** would send a purportedly equivalent amount of Tether to Victim-Investor 3's and Victim-Investor 4's HyperFund account. Victim-Investor 4 further stated that **BURTON** did transfer a purportedly

9

equivalent amount of Tether from his own HyperFund account to Victim-Investor 3's and Victim-Investor 4's HyperFund account.

32. I have reviewed bank records associated with **BURTON**'s personal bank accounts and the accounts for the companies over which he has control. Analysis of these records show that from June 2020 through January 2022, **BURTON** received 562 wire transfers or cashier's checks, totaling $7,851,711, from individuals who wished to invest in HyperFund.

   a. Of these 562 transactions, 342 were made in or after July 2021, when HyperFund began blocking investors' ability to convert HU to cryptocurrency (which in turn could be converted to fiat currency). These 342 transactions totaled $5,833,562. In other words, in and after July 2021, **BURTON** took investors' fiat currency and transferred worthless HU from his HyperFund account to investors' HyperFund accounts.

33. An analysis of **BURTON**'s bank information shows that the majority of investor payments were made to Burton Holdings Co., which maintains an address at 137 National Plaza, Oxon Hill, Maryland.

34. An analysis of these payments shows that they originated from investors in the District of Maryland and at least twenty-six other states, one U.S. territory, and Canada.

35. At no point did **BURTON** or any of the entities he controls register a money transmitting business with FinCEN.

## **CONCLUSION**

36. Based on the information set forth in this Affidavit, I respectfully submit there is probable cause that **RODNEY BURTON** committed violations of 18 U.S.C. § 1960 (Operating

10

Unlicensed Money Transmitting Business) and 18 U.S.C. § 371 (Conspiracy to Commit Operating Unlicensed Money Transmitting Business).

_____
Special Agent Andrew J. Accardi
Internal Revenue Service

Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 4(d) this __29th__ day of _December_, 2023.

_____
Hon. Charles D. Austin
United State Magistrate Judge